UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

SECURITIES AND EXCHANGE                    :
COMMISSION,
                                           :

                Plaintiff,        :        **MEMORANDUM DECISION
                                                    AND ORDER**

    -against-                              :        01 Civ. 11586 (GBD)(FM)

SAVE THE WORLD AIR, INC. and
JEFFREY ALAN MULLER,                       :

             Defendants.            :

-----------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

I.     <u>Introduction</u>

        The Securities and Exchange Commission ("Commission") has moved for

summary judgment in this action as against defendant Jeffrey Alan Muller ("Muller"), the

former board chairman and chief executive officer of Save the World Air, Inc. ("STWA"

or the "Company"), who is alleged to have violated the Securities Act of 1933

("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").  For the

reasons that follow, the Commission's motion is granted, and Muller is (a) ordered to

disgorge the profits that he received from his sales of STWA stock as well as any STWA

shares that he continues to hold, (b) directed to pay prejudgment interest and a monetary

penalty of $100,000, (c) enjoined from committing further securities law violations, and

(d) barred from serving as a director or officer of a public company in the United States for a period of twenty years.[1]

II.    Procedural History

On December 19, 2001, the Commission filed a complaint against STWA, Muller, and Billy Blackwelder ("Blackwelder"), who is described therein as the Company's marketing consultant. (Docket No. 1). Subsequently, on June 27, 2002, the Court entered a final judgment against STWA, which consented to a permanent injunction against violating the antifraud and reporting provisions of the securities laws. (Docket No. 11 at 2-4). On November 25, 2003, the Court entered a final judgment against Blackwelder, who similarly consented to being permanently enjoined from violating the antifraud and reporting provisions of the securities laws and paid a fine of $6523. (Docket No. 25 at 2-5).

Thus, the only defendant remaining in the Commission's original suit is Muller.[2]  On July 30, 2002, the Court entered a preliminary injunction restraining Muller,

---

[1]    On September 9, 2005, pursuant to the parties' written consent, the Honorable George B. Daniels, to whom this case is assigned, directed that all dispositive pretrial motions be referred to me for decision. (See Docket No. 95).

[2]    There are other parties and claims in this case. More specifically, on July 2, 2002, the Company filed a cross-claim against Muller, his wife, Lyn Muller, and sixteen other named defendants. (Docket No. 14). Although Muller and two of the cross-claim defendants filed motions to dismiss the cross-claims and Muller moved for summary judgment against the Company, Judge Daniels denied those motions on December 22, 2004. (See Docket Nos. 28-31, 62).

The Company has moved for summary judgment against Muller on its cross
(continued...)

inter alia, from selling or transferring his STWA shares or his interest in a pending patent for the Device; serving as an officer or director of, or seeking to influence or control, STWA; or taking any action to injure STWA.  (Docket No. 16).

On May 28, 2004, the Commission moved for summary judgment against Muller.  (Docket Nos. 65-70).  Muller responded to that motion on October 30, 2004, and the Commission filed its reply on November 17, 2004.  (Docket Nos. 53-54).[3] Accordingly, the motion is now fully submitted.

III.    Facts

Although the Commission has submitted the statement of undisputed facts required by Local Civil Rule 56.1,  Muller has not served or filed a counter-statement. Moreover, many of the factual assertions in his papers are bereft of any citations to admissible evidence.  For these reasons, the facts set forth in the Commission's Rule 56.1 statement must be deemed admitted.  See Local Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); Loucar v. Boston Market Corp., 294 F. Supp. 2d 472, 478 (S.D.N.Y. 2003) (plaintiff's "unsupported, conclusory statements and denials" cannot refute

_____

[2](...continued)
claims.  That motion is not addressed in this Memorandum Decision and Order.

[3]    Muller's opposition memorandum was never filed.  I recently requested that it be filed, but learned that it has been lost.

defendant's "properly-supported statements of material fact in its Rule 56.1 Statement");

Gadsen v. Jones Lang Lasalle Americas, Inc., 210 F. Supp. 2d 430, 438 (S.D.N.Y. 2002)

("Courts in this circuit have not hesitated to deem admitted the facts in a movant's Local

Civil Rule 56.1 Statement that have not been controverted by a Local Civil Rule 56.1

statement from the nonmoving party.").

Accordingly, unless otherwise indicated, the following facts are undisputed:

A.    Background

The Company was incorporated in Nevada on February 18, 1998, as the

Mandalay Capital Corporation Inc. ("Mandalay").  (See Decl. of Valerie A. Szczepanik,

Esq., dated May 28, 2004 ("Szczepanik Decl."), Ex. 5, Tab A at 5).[4]  In February 1999,

the Company's name was changed to Save the World Air, Inc.  (Ex. 4 at Tab 2).  Muller

functioned as STWA's chairman and chief executive officer from at least February 1o,

1999, until October 17, 2001, when Edward Masry assumed both positions.[5]  (See Form

8-K, dated Oct. 30, 2001, available at http://www.sec.gov/Archives/edgar/data/1103795/

000101968701501005/0001019687-01-501005.txt) (last visited Oct.20, 2005); Exs. 4 at

---

[4]       Unless otherwise indicated, all subsequent citations to exhibit numbers refer to the exhibits attached to the Szczepanik Declaration.

[5]       Although Muller is no longer a director or officer of the Company, he has more recently been involved with Save the World Technologies, Inc. ("STWT"), a company that focuses on "the cloning, production, and growing of the Super Kiri Trees," which STWT alleges are "the world's fastest growing hardwood tree[s]," and the development of an "All Air Generator, which is a normal combustion engine converted to run on compressed air through a series of tanks, injectors, and non-return valves."  (Ex. 48 at 6).  In 2004, STWT circulated an offering memorandum for its shares, which described Muller as STWT's founder and president. (Id. at 12).

Tab 1, 5, Tab A at 10).[6]  According to Roger Neal, who drafted the Company's press releases, Muller approved "every single thing" that the Company disseminated.  (Ex. 30 at 45-47).  Since at least November 7, 2002, Muller and his wife have been involved in personal bankruptcy proceedings in Australia.  (See Form 10-QSB, dated May 20, 2005, at 26-27, at http://www.sec.gov/Archives/edgar/data/1103795/000095012905005557/v09 246e10qsb.htm#106) (last visited October 28, 2005).

On January 27, 2000, while Muller was at its helm, STWA filed a registration statement with the Commission pursuant to Section 12 of the Exchange Act. (See Exs. 4 (Tabs 5 & 9), 5 (Tab A)).  Subsequently, the Company's shares were traded on the NASDAQ's over-the-counter bulletin board under the symbol ZERO.  (See Ex. 4 at Tab 9).

In its initial filing, the Company described its primary business as involving a "Zero Pollution-Fuel Saving Device for motor vehicles or petrol driven engines" ("Device"), which would "reduce [ ] the toxicity of exhaust gas emissions" when fitted on an internal combustion engine's inlet manifold.  (Ex. 5, Tab A at 5).  STWA further stated that the Device would reduce the engine's "carbon monoxide, hydrocarbon[] and toxic

---

[6]        This publicly-filed document was not submitted to the Court by either of the parties but nonetheless may be judicially noticed.  See, e.g., Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991).

exhaust emissions" and possibly improve fuel economy.  (Id. at 8).  Two weeks later, the

Company described the Device in a press release as low-cost and "easily fitted to motor

vehicle[s]."  (Ex. 4 at Tab 2).

B.      Muller's Fraudulent Conduct

1.      Emissions Tests

As early as February 1999, the Company began to tout the Device through

press releases, interviews, television commercials, and a "worldwide marketing and

public relations tour."  (Exs. 4 (Tabs 11, 12, 14, 19), 11, 12).  The Company also

conducted tests of the Device at various locations in the United States, including New

York City, Boca Raton, and Los Angeles.  (See Exs. 4 (Tabs 4, 22-24, 34), 12).  Local

television stations covered several of these tests.  (See Ex. 4 at Tabs 4, 22).  In addition,

the Company issued press releases reporting the results of the tests which were posted on

its website.  (See Exs. 4 (Tabs 4, 22-24, 34), 12).  Promotional videos of the tests also

were distributed to investors.  (See Exs. 1-3).

According to Company press releases, the tests were "carried out under the

strictest government-controlled standards," using equipment that was "linked to U.S.

environmental standards agencies."  (See, e.g., Ex. 4 at Tab 4).  The press releases touted

the "[r]emarkable test results," which allegedly established "without any doubt that the

[D]evice works."  (See, e.g., Ex. 4 Tab 22).

One such test was conducted in Australia on February 22, 2000, in the

presence of government officials.  (See Ex. 18 (Decl. of Dr. Mathew Maliel, dated April

5, 2004), ¶ 8). Dr. Mathew Maliel, then the Assistant Manager of Sustainable Transport at the Australian Greenhouse Office ("AGO"), was among the officials who attended. (Id. ¶¶ 2, 8). The demonstration was held at a facility in Brisbane, Australia, owned by the Motor Trades Association of Queensland ("MTAQ") and consisted of two informational sessions and two workshop sessions. (Id. ¶¶ 4, 9). During the first workshop session, two test vehicles which did not have Devices attached were run to establish their emissions output. (Id. ¶ 9). At that point, the audience was taken to a separate room to hear "testimonials and talks," while the cars were being fitted with the Devices and undergoing testing in the MTAQ workshop. (Id.). The audience then was brought back to the workshop and shown the results of the tests. (Id.). According to Dr. Maliel, the test results were completed" while the audience was attending the second information session. (Id.).[7]

Following this demonstration, the Company issued a press release stating that it had "performed two Zero Emission Fuel Saver . . . tests for several Australian Government Agencies," including the AGO, at the MTAQ "Testing Lab." (Ex. 4 at Tab 8). According to the release, the tests used "two government approved exhaust analyzing machines, one being a portable testing unit owned by STWA and the other being supplied by the MTAQ." (Id.). The press release claimed that the MTAQ testing equipment

---

[7]     Muller has proffered the statements of John Le Blanc, a former Australian Federal Police Officer, and Peter Kimberley of "Surfers Paradise," who contend that the audience remained in the MTAQ workshop while the Devices were being installed and the testing was underway. (See Def.'s Mem. Exs. 10, 12).

confirmed that STWA's own equipment was properly calibrated. (Id.). The press release also stated that the test results were "[r]emarkable," and established "without any doubt that the [D]evice works." (Id.).

Contrary to these representations, the area at MTAQ where the test was conducted was not a laboratory, but simply a "replica of a basic repair facility for small motor vehicle repairers," which did not contain the equipment necessary to conduct scientific tests on emissions devices. (Ex. 20 (Dep. of Tony Selmes, taken on Feb. 24, 2003), at 6-7). Moreover, the MTAQ's equipment was calibrated only infrequently. (Id. at 3).

Although the press release stated that the test had been performed "for several Australian Government agencies," including the AGO, (Ex. 4 at Tab 8), STWA itself had initiated contact with the AGO, which evidently decided to send a representative because of "the persistent follow up by Muller's staff." (Ex. 18 at ¶ 6). Despite his attendance, however, neither Dr. Maliel nor the AGO had authorized the use of the AGO's name in conjunction with the STWA release. (Id. ¶ 19). Indeed, Dr. Maliel refused to sign a printout containing the purported test results, and he did not agree that the demonstration proved "without a doubt," as STWA claimed, that the Device worked. (Id. ¶¶ 17, 19).

The Company conducted another live test on June 13, 2000 at a Ford dealership in Los Angeles for a city council member and several city department heads. (Ex. 4 at Tab 23). As with the test in Australia, the Company claimed that the results of

the test proved "without any doubt that the [D]evice works." (Id.). Two of the officials present at the test were Fredrick Minassian, a program supervisor at the South Coast Air Quality Management District, and Scott Briasco, a Manager of Electric Transportation with the Department of Water and Power of the City of Los Angeles. (Exs. 22 at ¶¶ 1-2, 23 at ¶¶ 1-2). Both witnesses noted that the carbon monoxide level decreased after the Device was affixed to the test vehicle, a 1970 Ford Maverick, and the carburetor was adjusted. (Exs. 22 at ¶¶ 3-4, 23 at ¶ 4). Before the Device was installed, the carbon monoxide level of the car's exhaust emissions exceeded five percent. (Exs. 22 at ¶ 4, 23 at ¶ 4). Thereafter, the carbon monoxide level initially decreased to 2.5 percent, and, after a mechanic adjusted the carburetor, fell below one percent. (Id.). At the same time, however, the nitric oxide level rose from approximately 100 to more than 135 (and 110 after the carburetor was "adjusted"). (Exs. 22 at ¶ 4, 23 at ¶ 5(c)). Briasco concluded that the increase in the nitric oxide level was "a very negative aspect of the [Device] which would probably make [it] unsatisfactory, even if [it] decreased other emissions." (Ex. 23 at ¶ 5(c)). Moreover, both witnesses believed that the test results were inconclusive because the test was conducted on a car that was idling in neutral, rather than running on the road or on a dynamometer, and because much of the reduction in carbon monoxide emissions could have been explained solely by the adjustment of the carburetor. (Ex. 22 at ¶¶ 5-6, 23 at ¶¶ 5(a) &(d)).

2.     Compatibility of the Device

In its press releases, the Company claimed that the Device could be fitted to "motorcycles, automobiles, trucks, boats, and most other gasoline powered engines." (See, e.g., Ex. 4 at Tab 6).  In one promotional brochure, the Company also stated that the Device worked "on the inlet manifold of carburetor, single and dual fuel injection systems before the harmful gases are created."  (See Ex. 11).  Indeed, the Company elsewhere claimed that "the greatest asset" of the Device was "the simplicity and [ ] ease" with which it could be fitted "to any existing internal combustion engine."  (Ex. 12 (May 2000 STWA Business Plan) at 12).

These glowing descriptions of the Device stand in marked contrast to other statements that Muller has made.  Although Muller evidently failed to appear for his deposition in this case, he previously was questioned under oath by the Commission on October 5, 2001, as part of the Commission's formal administrative investigation into alleged wrongdoing at STWA.  (See Ex. 15).  During that testimony Muller stated that the Company had "originally started" with a Device that would "work on all petrol combustion driven engines with a carburetor."  (Id. at 173) (emphasis added).  Muller testified further that the Company had developed and tested a Device for engines using "center point" fuel injection, but was only "in R and D" with respect to a Device that could be used on a multi-point fuel injection system, which is the type employed on most new passenger vehicles in the United States.  (Id.; see also Ex. 16 (Decl. of Peter Hutchins, former Mechanical Engineer at the Envtl. Prot. Agency Nat'l Vehicle & Fuels

Lab., Appx. A at 3 ("multi-point fuel injection is presently used on essentially 100% of cars and light trucks sold in the U.S.").  Muller also conceded that in order to be used in passenger vehicles with multi-point fuel injection, the Device would have to be "incorporated in the manufacture[] . . . because it's more difficult to fit."  (Ex. 15 at 174).  During his own deposition testimony, Adrian Menzell, the Company's mechanic, agreed that the Device would not fit on an electronic fuel injector in a passenger car because "there's nowhere to put it," noting also that the Company had not had any "luck" in its efforts to design a Device which would work with such a system. (Ex. 17 at 14-15).

### 3.  Marketing of the Device

The Company repeatedly made optimistic assessments about its business prospects.  For example, in a press release dated February 10, 1999, the Company stated that it was "currently selling rights to fit the [Device] to 25,000 fitting stations throughout the world."  (Ex. 4 at Tab 1).  According to the press release, the Company expected "up to two percent market penetration per year, resulting in the sale of 25 million units per year."  (Id.).  The Company further elaborated upon the commercial prospects of the Device in a series of press releases issued between February 17 and June 29, 2000, which indicated that STWA planned an initial sale of one hundred licenses at an "average cost of $10 million."  (See Ex. 4 (Tabs 7-9, 11, 18, 25-26, 28)).

Notwithstanding the STWA press releases, Muller conceded in a December 7, 2000, interview with CEOcast (an internet journal) that the Device the Company had been touting "was not marketable" because it "wouldn't fit comfortably under the bonnet

of a car." (Ex. 24 at 3). During the interview, Muller further stated that the Company had a "new model" of the Device which fit "single and dual barrel cars and even fuel injection engines," although he later admitted to the Commission under oath that no version of that Device was commercially available for use on most of the passenger cars being manufactured in the United States. (See id.; Ex. 15 at 173-74).

4. Pancorp Transaction

On February 23, 1999, the Company issued a press release in which it claimed to have sold its first license for the Device to "Pancorp Australia Pty. Ltd." ("Pancorp") in exchange for $2.5 million (AU) and had received a "5% cash deposit," i.e., $125,000 (AU). (Ex. 4 at Tab 3). The release quoted Muller as saying that he believed, on the basis of that alleged deal, that the Company could realize its estimated revenue projection of twenty cents per share. (Id.).

On May 16, 2000, the Company announced that the Pancorp license, which had been "initiated verbally" the prior year was now "signed, sealed and delivered." (Ex. 4 at Tab 18). In its release, the Company described the total value of the license as "1.5 million dollars," which was $1 million less than it had previously announced, but did not explain this change. Consistent with the earlier release, the Company also stated that a cash deposit of $125,000 had been paid to the Company. (Id.). In subsequent filings with the Commission, the Company also included that $125,000 as income for the nine-month period ending September 30, 1999. (Ex. 5 at Tabs A-I).

At the time the Company announced the Pancorp deal, it had yet to be finalized. (Ex. 25 at 14). Indeed, Ulf Lorenz, who later signed a contract with STWA on behalf of Pancorp, testified that he was "horrified" and "angry" when he read the February 23rd press release because he knew it was false. (Id. at 28, 49-50). As he explained, there was at the time simply a verbal agreement between Pancorp and the Company to "have a look at the paper work and what's involved in the licen[s]e." (Id. at 29). When Lorenz called Muller to express his displeasure, however, Muller responded that the parties "had a verbal agreement" which was binding. (Id. at 50).

The contract between the Company and Pancorp, which is the subject of the May 16th release, is dated February 22, 1999, but was actually signed in May 2000. (Exs. 25 at 32-33, 26 at 2). Moreover, although it was the alleged licensee, Pancorp never paid the cash deposit. (Ex. 25 at 25). Instead, Muller told Lorenz that he would arrange for the deposit to be paid by a third party. (Id.). Bank records produced by the Commission establish that a miscellaneous deposit of $125,000 was made to Mandalay's account at Citibank on February 19, 1999. (Ex. 28).[8] The records further establish that the item deposited into the account originated from a Canadian account in the name of Boksbert Unternehmen. (Ex. 29). Muller contends, however, that a man named Walter Doyle paid

---

[8]     Citibank's records suggest that this deposit was made in U.S. dollars. (Id.). If so, the deposit was the equivalent of nearly $200,000 (AU) since the United States dollar was worth more than $1.56 (AU) on that date. (See www.x-rates.com (last visited Oct. 20, 2005)).

the deposit on behalf of Pancorp, and that the source of the deposit "is irrelevant to the terms of the contract."  (Def.'s Mem. at 20).

5.    Interest in the Device

On March 30, 2000, the Company issued a press release announcing that there had been a showing of "initial interest [in the Device] by a major automobile manufacturer."  (Ex. 4 at Tab 13).  The release stated that a "major automobile manufacturer" had indicated to Muller that it was "looking for a new direction to take in creating new ideas that can improve the environmental impact of their vehicles."  (Id.).  In a subsequent press release dated June 29, 2000, STWA disclosed that it was the Ford Motor Company ("Ford") that had "initiated" the contact with the Company, and that STWA was "looking forward . . . to set[ting] up a test on a new car."  (Id. at Tab 28).  At that time, however, the Company did not have a Device that could be used on an existing late-model car with a multi-point fuel injection system.

The press release appears to be based on a three-way conference call involving Muller, Chinu Bhavsar, a Senior Staff Technical Specialist in the Advanced Powertrain Engineering Department at Ford, and Michael Biondo, who worked at Ford as a Business Planning Specialist.  (Ex. 31 (Decl. of Chinu Bhavsar, dated Sept. 21, 2000, ¶¶ 1-2)).  Biondo contacted Muller a week earlier to inquire about the Device, and had asked Bhavsar to participate in the conference call.  (Id. ¶¶ 2, 6).  During the ensuing conversation, Bhavsar told Muller that he was unable to draw any conclusions about the effectiveness of the Device because the test results posted on the Company's website did

14

not conform to EPA standards.  (<u>Id.</u> ¶ 3).  After Muller requested that Ford test the Device, Bhavsar replied that the Company would first have to execute Ford's confidentiality agreement, and then furnish Ford with "reliable, EPA standardized data" regarding its prior tests of the Device.  (<u>Id.</u>).  Although Bhavsar was dubious that the Device held "much promise" for Ford, he sent Muller a copy of Ford's confidentiality agreement to execute.  That agreement, however, was never signed and returned.  (<u>Id.</u> ¶¶ 4, 6; <u>see also</u> Ex. 32 (facsimile of confidentiality agreement)).  Moreover, the Company never provided Ford with any EPA-standardized data.  There consequently was no further contact between the Company and Ford.  (Exs.15 at 194, 31 at ¶ 4).

C.    <u>STWA Stock Price Increase</u>

The Commission alleges that Muller engaged in his fraudulent campaign between February 1999 and July 2000. (<u>See</u> Pl.'s Mem. at 17).  On February 1, 1999, near the outset of the alleged fraud, the Company's stock was trading at $6.375 per share.  (Ex. 36 at 1).  The Company's share price then fell to a low of $0.10 per share by December 10, 1999, rose to $12 by July 6, 2000, and closed at $4.875 on July 19, 2000.  (Ex. 36).

The following day, the Commission temporarily suspended trading of the Company's stock because of "questions . . . about the accuracy and adequacy of publicly disseminated information concerning, among other things, the results of demonstration tests of [the Device] and [STWA's] purported relationship with the Ford Motor Company."  (Ex. 4 at Tab 37).

D. <u>Muller's Ownership and Sales of Company Stock</u>

On April 28, 1998, the Nevada Agency & Trust Company ("Nevada Agency"), acting as transfer agent for Mandalay, issued four million shares of STWA stock to Edward Skoda, who was then Mandalay's president. (Ex. 43). The stock was issued with a restrictive legend pursuant to Commission Rule 144. (<u>Id.</u>; <u>see</u> 17 C.F.R. § 230.144). Muller testified before the Commission that these shares subsequently were transferred to him.[9] (Ex. 15 at 19).

On December 29, 1998, Muller transferred the marketing and manufacturing rights to the Device to the Company, receiving, in return, an additional five million shares of STWA stock. (Ex. 5, Tab A (Reg. Stmt.) at 11-12).[10] Transfer records indicate that Muller sold all but 145,650 of those shares between September 1999 and December 2000. (Ex. 6). Although Muller generally charged purchasers the price at which the stock closed the day before the sale, he would at times set a lower price, (Exs. 13 at 51, 33 at 6). Muller advised the purchasers of these shares that they were avoiding brokerage fees by purchasing them "direct from the company." (Ex. 33 at 7).[11]

---

[9] In his opposition papers, Muller disputes ever receiving these shares. (<u>See</u> Def.'s Mem. at 33).

[10] The Registration Statement indicates that Muller was also to receive a cash payment of $500,000, but there is no indication that such a payment ever was made. (<u>See</u> <u>id.</u>).

[11] The proceeds of such sales actually were deposited into personal accounts maintained by Muller. (<u>See</u> Ex. 35 at 7). On at least one occasion, however, Muller's brother, Morrie Muller, paid for shares with a combination of money, a car, and land. (Ex. 41 at 16).

The Commission alleges that Muller committed reporting violations by failing to report or cause STWA to report the changes in ownership resulting from the transfer of four million shares of STWA stock from Edward Skoda to him and his sale of nearly five million additional shares.  (Pl.'s Mem. at 20).

IV.     Discussion

A.      Summary Judgment Standard

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the court concludes that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,'" and summary judgment must be granted.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

In deciding a motion for summary judgment, the court must "view the evidence in the light most favorable to the party against whom summary judgment is sought and . . . draw all permissible inferences in favor of that party."  Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997).  The Court must accept as true the non-moving party's

evidence, if supported by affidavits or other evidentiary material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254-57 (1986).  As such, "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact."  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).

In adjudicating a motion for summary judgment, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried."  Fischl, 128 F.3d at 55; see also Anderson, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248. Accordingly, "[i]f the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  Id. at 249-50 (citing Dombrowski v. Eastland, 387 U.S. 82, 87 (1967); Cities Serv. Co., 391 U.S. at 290); see also Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (the "'mere existence of a scintilla of evidence' . . . is . . . insufficient to defeat summary judgment") (quoting Anderson, 477 U.S. at 252).

Although the same summary judgment rules are applicable when a party is proceeding pro se, "special latitude" is appropriate to ensure that a meritorious claim is not foreclosed simply because the papers submitted in opposition to the motion are worded inartfully.  Morris v. Citibank, N.A., No. 97 Civ. 2127 (JGK), 1998 WL 386175,

at *2 (S.D.N.Y. July 8, 1998); see also Estelle v. Gamble, 429 U.S. 97, 106 (1976) (pro se

complaint should be held to a "less stringent standard[] than formal pleadings drafted by

lawyers"); McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (pleadings should be

read liberally and interpreted to "raise the strongest arguments that they suggest")

(quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)).  By the same token,

however, "a pro se party's 'bald assertion,' completely unsupported by evidence, is not

sufficient to overcome a motion for summary judgment."  Odom v. Keane, No. 95 Civ.

9941 (SS), 1997 WL 576088, at *3 (S.D.N.Y. Sept. 17, 1997) (quoting Carey v.

Crescenzi, 923 F.2d 18, 21 (2d Cir. 1995)).

        The summary judgment analysis is not changed by the fact that the

Commission is the plaintiff here.  See SEC v. Research Automation Corp., 585 F.2d 31,

33-34 (2d Cir. 1978).  Nor does the fact that the Commission seeks injunctive relief as

part of its requested remedy alter the analysis.  Id.  Thus, to the extent that the Court is

asked to weigh questions of materiality, the Court may grant summary judgment only

"when the omissions and misrepresentations in question are 'so obviously important to

the investor, that reasonable minds cannot differ on the question of materiality.'"  SEC v.

Credit Bancorp, Ltd., 195 F. Supp. 2d 475, 492 (S.D.N.Y. 2002) (quoting Research

Automation Corp., 585 F.2d at 35).

B.     Section 17(a) and Rule 10b-5

The Commission alleges that Muller has made various misrepresentations

and omissions of material fact which constitute violations of Section 17(a) of the

Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5.

Section 17(a) of the Securities Act states that:

It shall be unlawful for any person in the offer or sale of any
securities . . . by the use of any means or instruments of
transportation or communication in interstate commerce or by
use of the mails, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue
statement of a material fact or any omission to state a material
fact necessary in order to make the statements made, in light
of the circumstances under which they were made, not
misleading; or

(3) to engage in any transaction, practice, or course of business which
operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a) (2000).

Section 10(b) of the Exchange Act prohibits "any person . . . [t]o use or

employ, in connection with the purchase or sale . . . any manipulative or deceptive device

or contrivance" in violation of the rules and regulations prescribed by the Commission.

15 U.S.C. § 78j(b) (2000).

Rule 10b-5, promulgated thereunder, provides that:

It shall be unlawful for any person, directly or indirectly, by
the use of any means or instrumentality of interstate

commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The elements required to establish a violation of Sections 17(a) and 10(b) are "essentially the same." SEC v. Monarch Funding, 192 F.3d 295, 308 (2d Cir. 1999). Thus, to be liable for securities fraud under either statute, a defendant must have "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." Id. In this action, because the Commission is the plaintiff, it need not prove loss causation, reliance, or damages in order to prevail on these claims. Credit Bancorp, 195 F. Supp. 2d at 490-91.

1.    Jurisdiction

At the outset, for the Court to have jurisdiction over an alleged violation of Sections 17(a) or 10(b), the fraudulent scheme alleged must have involved either the use of interstate commerce or the mails. See Richter v. Achs, 962 F. Supp. 31, 33 (S.D.N.Y. 1997). However, "the fraud itself need not be transmitted through the jurisdictional

21

means." Id. This "extremely broad" jurisdictional requirement consequently may be satisfied through a showing that "the designated means [were] used in some phase of the transaction." Id.

Here, it is undisputed that Muller transferred his personal shares of restricted STWA stock to others through the Nevada Agency. In the course of doing so, he used interstate telephone lines to transmit faxes and caused the Nevada Agency to send stock certificates via an overnight courier service to himself and others. (See Ex. 6). These actions are sufficient to establish the requisite nexus to interstate commerce. See, e.g., Glazer v. AA Premier Realty, Ltd., 294 F. Supp. 2d 296, 303-04 (E.D.N.Y. 2003) (use of mails to open a fraudulent credit card account sufficient to confer jurisdiction); Abrams & Wofsy v. Renaissance Inv. Corp., No. 87-CV-1931-WCO, 1991 WL 319034, at *4 (N.D. Ga Aug. 22, 1991) (use of mails, overnight couriers and interstate phone calls confers jurisdiction).

## 2. Material Omissions

An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)); see also Azrielli v. Cohen Law Offices, 21 F.3d 512, 518 (2d Cir. 1994) ("A fact is to be considered material if there is a substantial likelihood that a

reasonable person would consider it important in deciding whether to buy or sell shares [of stock].").

Here, there is no question that Muller failed to provide adequate disclosure concerning the extent to which the Device could be used in conjunction with various engines. In its press releases, the Company frequently claimed without qualification that the Device would work on "automobiles, trucks, motorcycles, boats and most other gasoline powered engines" and "enable gasoline engines to reduce the amount of fuel needed." (See, e.g., Ex. 4 at Tabs 4, 5). In its brochures and business plans, the Company similarly claimed that the Device could be fitted to all internal combustion engines. (See Exs. 11, 12). It is uncontested, however, that the Device was not compatible with the multi-point fuel injection systems used on virtually all new cars and light trucks manufactured in the United States. The fact that there was no version of the Device that could then be successfully used in this large segment of the domestic automotive market plainly was material to investors – especially since the Company was conducting many of its public tests using cars rather than lawnmowers, thereby suggesting that it was ready to enter that segment of the market.

Muller also misrepresented the Company's dealings with Pancorp. In the Company's public announcements, Muller claimed that STWA had entered into a license agreement with Pancorp, even though no written contract existed at the time. Moreover, Pancorp never tendered the $125,000 payment that was reported in the Company's press

release and subsequent filings with the Commission. Indeed, in his papers, Muller concedes that the $125,000 payment was made by a third party, rather than Pancorp. (Def.'s Mem. at 20). If so, that fact unquestionably was material and should have been disclosed.

Although Muller claims that the source of the cash payment was irrelevant to the terms of the contract, the issue before this Court is not one of contract law. Rather, the question is what a reasonable investor would have considered important in determining whether to purchase the Company's stock. The fact that a third party, rather than the company allegedly acquiring a license to distribute the Device, was the source of the only payment made in connection with the license obviously would have been of considerable interest to investors.

Finally, Muller caused the Company to represent to investors that it had tested its Device under the "strictest government-controlled standards," using equipment that was "linked to U.S. environmental standards agencies." (See, e.g., Ex. 4 at Tab 4). In fact, the tests did not meet the EPA's requirements and were conducted using the sort of equipment that routinely would be used at a state motor vehicle inspection station to check for excessive carbon monoxide emissions. Consistent with the misrepresentations concerning the test results, Muller also caused the Company to represent that it was looking forward to setting up a test on a new car for the Ford Motor Company, when it

knew that it had no Device that could then be used on such a vehicle with a multi-point fuel injection system.

Each of these statements (and other similar ones) clearly establish that Muller caused the Company to make material misrepresentations and omit material facts in communicating with potential investors.[12]

3.  Scienter

To be liable under the securities laws, Muller generally must have acted with scienter. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976). (Proof of scienter is not required, however, to establish violations of Sections 17(a)(2) or (a)(3) of the Exchange Act. See Monarch Funding, 192 F.3d at 308). As defined by the Supreme Court, "scienter" means a "mental state embracing intent to deceive, manipulate, or defraud." Hochfelder, 425 U.S. at 193 n.12. Mere negligence is not sufficient to establish scienter, but knowing misconduct is. SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996). Scienter also may be found in circumstances where there has been a "reckless disregard for the truth," including "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998). Such recklessness may be inferred from an

_____

[12] Furthermore, the fact that all the press releases issued by the Company contain "Safe Harbor Statements" is no defense. The misrepresentations made here regarding, inter alia, the Device's compatibility with most cars and the Pancorp transaction were not projections or forecasts of future activity, but misrepresentations of presently existing or past facts not protected as forward-looking statements. See 15 U.S.C. § 78u-5.

"egregious refusal to see the obvious, or to investigate the doubtful." In re Carter-Wallace, Inc., Sec. Litig., 220 F.3d 36, 40 (2d Cir. 2000). Additionally, a court may infer scienter when a defendant "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that [his] public statements were not accurate; or (4) failed to check information [he] had a duty to monitor." Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000) (internal citations omitted).

In this case, as previously noted, Muller caused the Company to issue press releases claiming that its tests were "carried out under the strictest government-controlled standards" using equipment "linked to U.S. environmental standards agencies." (See, e.g., Ex. 4 at Tab 4). At best, however, the Company had tested its device using standard equipment available at most smog inspection stations. Similarly, while the Company's press releases stated that its Device would work on all internal combustion engines, later admissions by Muller confirm that the Device could not have been installed on cars with multipoint fuel injection systems – an obviously critical market – because it would not fit under the hood.

Although Muller seeks to dismiss the foregoing statements as mere puffery, the evidence also establishes that Muller was aware of significant discrepancies between the Company's disclosures concerning the alleged Pancorp transaction and the actual facts. Thus, even if Muller could plausibly claim that the press release announcing the

Pancorp transaction reflected a legitimate misunderstanding between the parties with respect to its enforceability, the telephone call that he subsequently received from Lorenz, who was "angry" about the press release and its "false" description of events, should have triggered a corrective disclosure from the Company. No such disclosure, however, ever was made. In addition, although the clear implication of the Company's press release was that Pancorp would pay the Company $125,000 for its license, Muller himself told Lorenz that Pancorp would not be held responsible for this payment. This material provision of the alleged oral agreement between the Company and Pancorp was never disclosed to investors, who mistakenly assumed that Pancorp had made a substantial down payment on a $2.5 million (AU) contract.

In sum, the evidence establishes that Muller was the head of the Company and controlled the information that it released. He was aware that the Company's press releases and regulatory filings contained material misstatements and failed to disclose material facts, but failed to take corrective steps. The Commission therefore has adequately established the scienter element of its claims. See SEC v. Mandaci, No. 00 Civ. 6635 (LTS), 2004 WL 2153879, at *10-*11 (S.D.N.Y. Sept. 27, 2004) (finding defendant acted with scienter where he offered predictions that he "could not have reasonably believed" before reselling his stock at a profit).

4.      "In Connection With" Requirement

To prevail, the Commission also must show that Muller's conduct was undertaken "in connection with" the offer, purchase, or sale of securities.  An "offer" includes "every attempt or offer to dispose of, or solicitation of an offer to buy;" a "purchase" includes "any contract to buy, purchase or otherwise acquire;" and a "sale" includes "every contract of sale or disposition of a security or interest in a security, for value."  15 U.S.C. §§ 77b(a)(3), 78c(a)(13).  In keeping with the principle that Section 10(b) is to be "be read flexibly, not technically and restrictively," courts have broadly construed the "in connection with" requirement.  In re Ames Dep't Stores, Inc. Stock Litig., 991 F.2d 953, 962 (2d Cir. 1993) (quoting Sup't of Ins. v. Bankers' Life and Cas. Co., 404 U.S. 6, 12 (1971)).  Therefore, the "in connection with" requirement is satisfied when there is a "fraudulent scheme in which the securities transactions and breaches of fiduciary duty coincide" and are not "independent events." SEC v. Zandford, 535 U.S. 813, 825 (2002).

The uncontradicted evidence in this case establishes/ that Muller sold almost five million shares of STWA stock during the time period in which he was making (and causing the Company to make) materially false statements and omit material facts. As disclosed by his filings with the Commission, Muller also made a substantial profit from these sales.  The overlap between the period of Muller's sales and the period of his fraudulent conduct is plainly sufficient to satisfy the "in connection with" requirement.

See Mandaci, 2004 WL 2153879, at *10 (fraud found to be "in connection with" the purchase of securities where the Commission's evidence demonstrated "that the scheme to defraud coincided with [the defendant's] and the general public's trading in securities").

C.     Sections 13(a) and (b) of the Exchange Act

The Commission also alleges that Muller violated Sections 13(a) and (b) of the Exchange Act, and the rules promulgated thereunder,  through the Company's misleading reporting of the revenues allegedly arising out of the Pancorp transaction. (Pl.'s Mem. at 28-30).  Section 13(a) states that issuers of securities must file "such information and documents as the Commission shall require."  15 U.S.C. § 78m(a)(1). Under Rules 13a-1 and 13a-13, issuers consequently must file quarterly and annual reports. 17 C.F.R. §§ 240.13a-1, 13a-13.

Section 13(b)(2)(A) requires that issuers who are subject to the reporting provisions of the Exchange Act "make and keep books, records, and accounts, which . . . accurately and fairly reflect the[ir] transactions and dispositions of the[ir] assets."  15 U.S.C. § 78m(b)(2)(A).  Rule 13b2-1 thereunder, in turn, provides that "[n]o person shall directly or indirectly, falsify or cause to be falsified any book, record or account subject to section 13(b)(2)(A)."  17 C.F.R. § 240.13b2-1.  Similarly, Rule 12b-20 requires that issuers add "such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading."  17 C.F.R. § 240.12b-20.

Each of these provisions is directly applicable to Muller by virtue of Section

20(a) of the Exchange Act, which gives rise to liability on the part of a control person of

another person alleged to have been a primary securities law violator.  That section

provides:

> Every person who, directly or indirectly, controls any person
> liable under any provision of this chapter or of any rule or
> regulation thereunder shall also be liable jointly and severally
> with and to the same extent as such controlled person . . . is
> liable, unless the controlling person acted in good faith and
> did not directly or indirectly induce the act or acts constituting
> the violation or cause of action.

15 U.S.C. § 78t(a).  Accordingly, to make out a Section 20(a) claim, a plaintiff must

establish two elements: "(1) a primary violation by a controlled person and; (2) direct or

indirect control of the primary violator by the defendant."  In re Worldcom, Inc. Secs.

Litig., 294 F. Supp. 2d 392, 414 (S.D.N.Y. 2003).  The statute also provides for a good

faith defense.  Id.

In its filings with the Commission, the Company indicated that the cash

payment of $125,000 that it received was revenue from the sale of licenses.  (See, e.g.,

Ex. 5, Tab A at 7).  As Muller himself admits, however, Pancorp never paid any money to

the Company for a license; rather, an unrelated third party named Walter Doyle made the

payment.  Thus, contrary to STWA's representations, the payment was not revenue

attributable to the Pancorp license.

Muller argues that the statement in the Company's regulatory filings is true

on its face because it indicates only that a cash payment was paid in connection with the

30

Pancorp transaction and does not identify the source of the payment. Simply put, this mischaracterizes the disclosure, which states: "The Company had revenues of $125,000 from sale of Licenses." (Id.). The clear implication of this disclosure was that the payment was made by Pancorp. Accordingly, because the source of the funds was apparently unconnected to Pancorp, this fact should have been disclosed. Indeed, the need for further disclosure is particularly obvious here since the cash payment represented one of the Company's relatively few sources of revenue. Having failed to disclose that Pancorp was not the source of the cash payment, the Company did not accurately reflect the Pancorp transaction in its filings. Furthermore, there is no indication that the Company has ever corrected its misleading filings regarding Pancorp. For these reasons, the Commission plainly has established a violation of Section 13(b)(2)(A) and the rules thereunder.

It is undisputed that Muller was the chairman and chief executive officer of the Company during the period when this violation occurred. As such, he is a control person liable for its misconduct pursuant to Section 20(a) of the Exchange Act. Moreover, there is no evidence that Muller made adequate disclosure to the Company's auditors (or anyone else for that matter) concerning the source of the $125,000 down payment. There consequently is no evidence from which a reasonable finder of fact could conclude that Muller acted in good faith and did not induce the acts constituting the violation. It follows that Muller is personally liable for the Company's violation of Sections 13(a) and (b) of the Exchange Act and the rules thereunder.

D.    Section 16(a)

The Commission's final claim is that Muller violated Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Rules 16a-2 and 16a-3 thereunder, by failing to report his changes in ownership of Company stock.  (Pl.'s Mem. at 30).  Section 16(a) mandates that officers, directors and persons directly or indirectly holding more than ten percent of any class of any registered security periodically file statements with the Commission regarding changes in their ownership of that security.  15 U.S.C. § 78p.  Rule 16a-3, in turn, requires that an annual statement of beneficial ownership, known as a Form 5, be filed by such persons within 45 days after the end of the issuer's fiscal year.  17 C.F.R. 240.16a-3(f).  Here, the Nevada Agency's transfer records conclusively establish that Muller sold close to five million of his shares in the Company prior to December 2000.  Nevertheless, Muller first filed a Form 5 disclosing these sales on April 30, 2004.  (See Ex. 5; http://www.sec.gov/cgi-bin/browse-edgar?action=getcompany& CIK=0001103795 &type=& dateb= &owner=include&start=0) (last visited Oct. 26, 2005).  As a consequence, the undisputed facts show that Muller violated Section 16(a) of the Exchange Act and Rule 16a-3 thereunder.

E.    Requested Relief

The Commission requests several forms of relief, including the issuance of a permanent injunction, a bar against Muller's future service as a director or officer of a public company, the disgorgement of Muller's ill-gotten gains, prejudgment interest, and civil penalties.

1. <u>Injunctive Relief</u>

Both the Securities Act and the Exchange Act permit the issuance of a temporary or permanent injunction in a suit by the Commission without the posting of a bond if a person is "engaged or about to engage in any acts or practices" which violate the Act. 15 U.S.C. §§ 77t(b), 78u(d)(1). Once a court has found violations of the securities laws, it has "broad equitable power" to fashion the appropriate remedy. <u>First Jersey</u>, 101 F.3d at 1474. Among other things, the court may grant a permanent injunction against future violations of the securities laws when "there is a likelihood that, unless enjoined, the violations will continue." <u>Id.</u> at 1477 (internal quotation omitted); <u>see also</u> <u>SEC v. Cavanagh</u>, 155 F.3d 129, 135 (2d Cir. 1998) (requiring a "substantial likelihood of future violations"). In making this determination, the court may examine the level of the defendant's culpability, and whether the violations were systematic or isolated occurrences. <u>First Jersey</u>, 101 F.3d at 1477.

Here, the Commission has submitted ample evidence that Muller's transgressions cannot be dismissed as an isolated event. Indeed, on June 2, 1997, Muller entered into an undertaking with the Australian Securities Commission (now known as the Australian Securities and Investments Commission), in which he agreed not to make any further sales of the securities of another company (Save the World Technologies Ltd.) until its prospectus was registered. (Ex. 46 at 4). Less than two years later, Muller embarked on a course of fraudulent conduct that apparently ended only when the Commission suspended the trading of STWA securities. Despite the extensive

33

misconduct shown by the Commission, Muller persists in his refusal to admit that he has engaged in any wrongful activities. For example, Muller maintains that the circumstances surrounding the cash payment from the Pancorp transaction are completely benign and need not have been disclosed, even though the Company's statements plainly were intended to mislead prospective investors. Muller also blithely ignores certain of his other violations, such as failure to file any Forms 5 until some four years after the fact. Given Muller's sordid track record, there plainly is a substantial risk that he will continue to flout this nation's securities laws unless he is enjoined. For this reason, permanent injunctive relief clearly is appropriate.[13] See First Jersey, 101 F.3d at 1478 (permanent injunction warranted "[i]n light of [the] defendants' disciplinary record, their deliberate and systematic frauds in the present case, and their continued protestations of innocence"); SEC v. Commonwealth Chem. Secs., Inc., 574 F.2d 90, 99 (2d Cir. 1978) ("[t]he ultimate test is whether the defendant's past conduct indicates . . . that there is a reasonable likelihood of further violation in the future") (quoting 3 L. Loss, Securities Regulation 1976 (1961) (emphasis deleted)).

---

[13]     Although I have not considered it in determining that injunctive relief is warranted, I note that the Commission's exhibits also include an article published in an Australian newspaper more than two years after this lawsuit was filed which indicates that Muller was seeking to raise nearly $1 million for STWT through an offering memorandum which stated that brokers and dealers would be paid "commissions of up to 10 per cent on the $1 shares being offered." (Ex. 47).

2. Director/Officer Bar

The Commission also seeks to have Muller permanently barred from acting as a director or an officer of any publicly traded company. Pursuant to 15 U.S.C. §§ 77t(e) and 78u(d)(2), a court may "prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated [Section 10(b) of the Exchange Act or Section 17(a) of the Securities Act] from acting as an officer or director . . . if the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer."

A district court has "substantial discretion" in deciding whether to impose a director/officer bar. SEC v. Patel, 61 F.3d 137, 141 (2d Cir. 1995). Among the factors that the court may consider in exercising this discretion are "([a]) the 'egregiousness' of the underlying securities law violation; ([b]) the defendant's 'repeat offender' status; ([c]) the defendant's 'role' or position when he engaged in the fraud; ([d]) the defendant's degree of scienter; ([e]) the defendant's economic stake in the violation; and ([f]) the likelihood that misconduct will recur." Id. at 142. Moreover, while it is "not essential" that a defendant have committed past violations before a lifetime ban is imposed, it is "essential, in the absence of such violations, that a district court articulate the factual basis for a finding of the likelihood of recurrence." Id. Before imposing a permanent bar, a court should also "consider whether a conditional bar (e.g., a bar limited to a particular industry) and/or a bar limited in time (e.g., a bar of five years) might be sufficient, especially where there is no prior history of unfitness." Id.

Each of the foregoing factors suggests that a ban is appropriate here. Over the course of approximately one and one-half years, Muller engaged in a scheme to defraud STWA's investors through material misstatements and omissions of material fact. Moreover, his misconduct related to the very core of STWA's business. Thus, he misrepresented its only product – the Device – as one which could be used on all internal combustion engines, although he knew full well that it could not then be used on most new passenger vehicles in the United States. Muller further misrepresented key information about the Company's financial prospects by suggesting that Pancorp had purchased a license at a stage where no agreement had in fact been signed, and later making it appear that Pancorp had made a down payment when it actually had not spent any money to acquire what appears to have been the only license "sold" during Muller's tenure at the Company. Through means such as these, Muller repeatedly represented to the investing public that STWA had a viable new product at a time when it plainly did not. Furthermore, although Muller evidently had no track record of securities fraud in this country, he had been cited previously in Australia for selling unregistered securities. Indeed, the misconduct giving rise to this case began less than two years after he gave an undertaking to the Australian Securities Commission. It also is clear that Muller was the person primarily responsible for the fraud on STWA's investors since he served as board chairman and chief executive officer and is directly tied to virtually every act of wrongdoing cited by the Commission as the basis for its suit.

Despite Muller's protestations of innocence, it is clear that he must have known investors were being furnished false and misleading information concerning the Company, its Device, and its earnings. Rather than correcting such errors, however, Muller embraced them so that he could sell millions of shares of STWA stock from his personal hoard, thereby exhibiting a high degree of scienter. Finally, despite overwhelming evidence to the contrary, Muller has failed to acknowledge that he engaged in any wrongdoing.

On the other hand, Muller's base of operations is in another country, and this case marks the first time he has been accused of wrongdoing in the United States. There also is no indication that Muller has violated the preliminary injunction entered against him or the permanent injunction entered against the Company and its officers, directors, and agents. [check wording]. For these reasons, although I recognize that a permanent ban would likely not be an abuse of discretion, I have concluded that the prohibition against Muller serving as an officer or director of any public company should be limited to twenty years from the date hereof.

        3.    <u>Disgorgement and Prejudgment Interest</u>

The Commission also seeks disgorgement. The remedy of disgorgement forces a defendant to give up his "ill-gotten gains," thereby effectuating "the deterrence objectives of the securities laws." <u>SEC v. Wang</u>, 944 F.2d 80, 85 (2d Cir. 1991). The goal is "'not to compensate investors,' but rather to force 'a defendant to give up the amount by which he was unjustly enriched.'" <u>SEC v. Robinson</u>, 00 Civ. 7452

(RMB)(AJP), 2002 WL 1552049, at *7 (S.D.N.Y. July 16, 2002) (quoting Commonwealth Chem., 574 F.2d at 102). As with the other forms of relief requested by the Commission, the Court has broad discretion in determining whether to order the defendant to disgorge his profits. First Jersey, 101 F.3d at 1474.

The Court also has broad discretion in calculating the amount to be disgorged. The disgorgement must be "causally connected to the violation," but it need only be a reasonable approximation of the profits amassed through the fraudulent conduct. Id. at 1474-75. Moreover, once the Commission has demonstrated that the requested disgorgement is a reasonable approximation of the ill-gotten gains, "the burden shifts to the defendant to demonstrat[e] that he received less than the full amount allegedly misappropriated and sought to be disgorged." Robinson, 2002 WL 1552049, at *8. Neither the defendant's financial hardship nor the fact that the disgorged funds will not be returned to the defrauded investors is a reason to deny the Commission's request for disgorgement. Id. at *7-*8.

When he testified before the Commission during the course of its investigation, Muller stated that he sold the "majority" of the five million shares of STWA stock that he received from the Company in exchange for the marketing and manufacturing rights to the Device. (See Ex. 15 at 135). Indeed, his own records confirm that he sold all or virtually all of those shares. (See Def.'s Mem. Ex. 18 at 1-15). These sales were direct transfers of restricted stock from Muller to the purchasers, not market sales.

Two purchasers of Muller's stock both testified that they acquired their shares at the previous day's closing price. (See Exs. 33 (Dep. of David Steven Brock) at 6, 35 (Dep. of Timothy Stephen Hays) at 6).  This testimony was confirmed by that of a former STWA employee, Joseph Henry Dowen, a/k/a "Joe Daniels," who testified that Muller sold his shares for "[w]hatever the price was on the day," although he also noted that "family and friends" sometimes "got it cheaper than the market price."  (Ex. 13 at 51). Finally, Muller himself testified that he typically sold his shares at a "price around about or below what it was trading [for] at the particular time."  (Ex. 15 at 135).

Using transfer records provided by Nevada Trust, and the closing prices of STWA's shares the day before each transfer, the Commission has calculated Muller's gross total profits from his sales of his restricted stock as $8,940,107.  (See Ex. 42).[14] This calculation assumes that Muller's shares were sold in each instance at the price at which STWA stock closed the previous day.[15]

In an effort to refute the Commission's assumptions, Muller has generated a spreadsheet of his own which sets forth his own calculations regarding each purchase of his shares.  (See Muller Ex. 18).  Muller has not provided the Court with any

---

[14]    Exhibit 42 is a spreadsheet detailing the Commission's calculations.  Although the Commission has not furnished the Court with an affidavit attesting to the accuracy of its spreadsheet, Muller has not disputed the accuracy of the Commission's mathematical calculations in his opposing papers.  Instead, Muller attacks various assumptions that the Commission made in arriving at its gross profit number.

[15]    The Commission contends that Muller's profit would be $9,108,074 if the share price on the date of each sale were to be used as a basis for calculation.  (See Pl.'s Mem. at 35 n. 127).  No spreadsheet supporting this claim has been furnished to the Court.

documentation, however, which would enable the Court to determine the accuracy of this summary. For example, there are numerous instances in which Muller claims on the summary that "no consideration" or "no funds" were received for particular shares, but he does not explain why. There also are unexplained references to a "split of stock" and transactions for which no value is listed even though Muller evidently received property in exchange for his stock.

As noted above, Muller previously testified that he sold his shares at a "price around about or below what it was trading [for] at the particular time." (Ex. 15 at 135). While this answer suggests that <u>some</u> of his shares were sold for less than fair market value, his spreadsheet indicates that he received only $1,875,444 (Australian) for his shares. Using the exchange rate in effect on October 29, 2004, the day before Muller signed his opposition papers, Muller's spreadsheet thus suggests that he received approximately $1,400,518 (U.S.) [$1,875,444 (AU) x .746798] from the purchasers of his STWA shares.[16] Whatever the shortcomings of the Commission's analysis may be, this calculation seems unrealistically low.

In his papers, Muller does not explain how his spreadsheet was generated or whether it is a record that he (or STWA) kept in the ordinary course of business. Muller also has failed to provide any source documents to the Court which might support his calculations. For these reasons, and in view of the prior testimony of Muller, Dowen and

---

[16]     (<u>See</u> www.x-rates.com (historic look-up) (last visited Oct. 21, 2005)).

the two purchasers of Muller's restricted shares, I find the Commission's assumption that the shares were sold at the previous day's closing price to be more consistent with what likely transpired in connection with Muller's off-market sales.[17]

Nevertheless, it does seem likely plausible that Muller would have distributed some of his shares at lower-than-market prices or for no consideration at all. It also seems plausible that Muller would have incurred certain expenses in connection with his sales of STWA shares.  For these reasons, in the exercise of its discretion, the Court will direct that Muller disgorge $7.5 million (U.S.) to the Commission.  While not dispositive of the Commission's right to disgorgement, I note that the ability to recover even this amount is uncertain since Muller and his wife evidently remain embroiled in bankruptcy proceedings in Australia.

The Commission also seeks an award of prejudgment interest on any sum that the Court directs Muller to disgorge.  (See Pl.'s Mem. at 36).  In determining whether to order prejudgment interest, the Court must consider "[a] the need to fully compensate the wronged party for actual damages suffered, [b] considerations of fairness and the relative equities of the award, [c] the remedial purpose of the statute involved, and/or [d] such other general principles as are deemed relevant by the court."  First Jersey, 101 F.3d at 1476.  Here, although it is doubtful that any of the disgorged funds will be returned to

---

[17]    Muller did file several Forms 5 with the Commission which indicate (according to the Commission's calculations) that he made approximately $1.5 million (US) in profit from his sales of STWA stock.  (See Muller Ex. 18; Pl's. Mem. at 35 n.126).  I do not consider these self-serving filings any more persuasive than his spreadsheet.

investors – most of whom appear to be Australian – Muller certainly has had the use of the funds derived from his improper sales activity for at least some period of time.  For this reason, it is appropriate that prejudgment interest be awarded.  As the Second Circuit noted in First Jersey, when the Commission orders disgorgement in its own proceedings, it generally determines prejudgment interest using the IRS underpayment rate, which reflects what it would cost to borrow money from the United States government.   Id. Courts also have used that rate in suits brought by the Commission. See id. (citing SEC v. Drexel Burnham Lambert, Inc., 837 F. Supp. 567, 612 n.8 (S.D.N.Y. 1993), aff'd, 16 F.3d 520 (1994).

The Commission alleges that Muller's fraudulent conduct began in February 1999.  Indeed, the first misleading press release from the Company is dated February 10, 1999.  (Ex. 4 at Tab 1).  As noted above, however,  Muller has been involved in a personal bankruptcy proceeding in Australia since at least November 7, 2002.  (See Form 10-QSB, dated May 20, 2005, at 26-27, at http://www.sec.gov/Archives /edgar/data/1103795/000095012905005557/v09246e10qsb.htm#106 (last visited October 28, 2005)).  On the assumption that Muller had access to his ill-gotten gains from early February 1999 through at least the date of his bankruptcy filing, the Court shall award the Commission prejudgment interest for the period from February 10, 1999, through November 7, 2002.  See First Jersey, 101 F.3d at 1477 (upholding the imposition of prejudgment interest "for the entire period from the time of defendants' unlawful gains to the entry of judgment" where "defendants plainly had the use of their unlawful profits for

the entire period"). Although I recognize that Muller may have had access to certain proceeds of his STWA fraud even after he filed for bankruptcy, the starting date that I have chosen provides a reasonable offset for this possibility since it runs from the beginning of his fraudulent scheme even though Muller clearly did not sell all of his stock at that time. Instead, as both his spreadsheet and the Commission's paperwork confirms, those sales occurred over time.

### 4. Disgorgement of Outstanding Shares

The Commission also requests that Muller be forced to disgorge the four million shares that he received from Edward Skoda and that those shares be canceled. (See Pl.'s Mem. at 37). The Commission argues that by ordering the disgorgement of these shares, the Court will be able to "prevent Muller from using his holdings to influence the operations of the company and . . . further profiting from sales of th[o]se shares." (Id.).

Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d)(5), as amended by Section 305(b) of the Sarbanes-Oxley Act, permits a federal court to grant "any equitable relief that may be appropriate or necessary for the benefit of investors." In this case, the Court's order requiring disgorgement to the Commission of the $7.5 million that Muller obtained through his fraudulent scheme will act as a deterrent to further misconduct on his part. Nonetheless, the victims of his fraud – many of whom are Australians – are unlikely to receive any compensation as a result of that order.

43

By comparison, as the Commission correctly observes, an order directing Muller to disgorge the four million shares of Company stock that he received from Skoda will reduce the number of STWA shares issued and outstanding and, therefore, increase the value of the remaining issued and outstanding shares. (Pl.'s Mem. at 37 & n. 129). The other STWA shareholders will consequently receive some benefit that can offset some of the losses that they have sustained as a result of Muller's fraud.

For this reason, the Court will direct that Muller disgorge any shares transferred to him by Skoda and any other shares of STWA stock that he currently may own.[18] To ensure that this directive is implemented, the Court will further order that any such shares be cancelled by the Company.

### 5. Civil Penalties

Finally, the Commission has requested that this Court impose the "maximum civil penalties" upon Muller. (Pl.'s Mem. in Supp. at 39). The Securities Act and Exchange Act each provide three tiers of potential penalties for persons who violate the securities laws. See 15 U.S.C. §§ 77t(d)(2), 78u(d)(3). The highest third-tier sanction calls for a natural person to be fined a maximum of $100,000 or the gross amount of the pecuniary gain that he wrongfully obtained, provided that the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and

---

[18] During the SEC's investigation, Muller admitted owning the Skoda shares. (See Ex. 15 at 19). In his opposition papers, he recants that testimony. (See Def.'s Mem. at 33) ("I do not own the stock; I have never owned the stock."). Obviously, if Muller does not own the stock, he cannot have any objection to its cancellation.

"directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).

In this case, Muller unquestionably engaged in a broad range of fraudulent conduct over a lengthy period of time. Moreover, the persons who purchased Company stock from him at an inflated price unquestionably sustained – or faced a significant risk of sustaining – substantial losses as a consequence of his misconduct. The imposition of a statutory third-tier penalty in the amount of $100,000 – while substantially less than Muller's ill-gotten gains – therefore is appropriate. See, e.g., SEC v. Roor, No. 99 Civ. 3372 (HB), 2004 WL 1933578, at *10-*11 (S.D.N.Y. Aug. 30, 2004) (third-tier penalty of $100,000 for a defendant ordered to disgorge $1 million); SEC v. Inorganic Recycling Corp., No. 99 Civ. 10159 (GEL), 2002 WL 1968341, at *5 (S.D.N.Y. Aug. 23, 2002) (third-tier penalty of $100,000 for a defendant ordered to disgorge $1,135,764); but see SEC v. Milan Capital Group, Inc., No. 00 Civ. 0108 (DLC), 2001 WL 921169, at *4 (S.D.N.Y. Aug. 14, 2001) (third-tier penalty of $10 million against defendants despite the SEC's request for a $20 million penalty); SEC v. Rosenfeld, No. 97 Civ. 1467 (WHP), 2001 WL 118612, at *4 (S.D.N.Y. Jan. 9, 2001) (third-tier penalty of $1,093,189 for defendant ordered to disgorge $1,093,189 where the SEC sought a penalty of $100,000 per violation, or in the alternative, the amount of the defendant's total pecuniary gain).

V.    Conclusion

The Commission's motion for summary judgment (Docket No. 65) is granted. Additionally, Muller is permanently enjoined from committing further securities

law violations, is barred from serving as an officer or director of a public company for a period of twenty years, shall disgorge to the Commission $7.5 million (U.S.), as well as any shares of STWA stock that he continues to own, and is directed to pay prejudgment interest on the $7.5 million from February 10, 1999, through November 7, 2002, and a civil penalty in the amount of $100,000. STWA is further directed to cancel any issued and outstanding shares of STWA stock still owned by Muller, including the four million shares that he received from Edward Skoda.

SO ORDERED.

Dated:    New York, New York
          November 15, 2005

                                        FRANK MAAS
                                        United States Magistrate Judge